**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MAXUM INDEMNITY COMPANY and SECURITY INSURANCE COMPANY OF HARTFORD as successor in interest to FIRE AND CASUALTY INSURANCE COMPANY OF CONNECTICUT,** | ) ) ) ) ) ) ) | |
| **Plaintiffs/Counter-Defendants,** | ) ) | **No. 06 C 4946** |
| **v.** | ) ) | **Judge Joan H. Lefkow** |
| **ECLIPSE MANUFACTURING CO., M&M RENTAL CENTER, INC., ROBERT HINMAN and ITALIA FOODS, INC.,** | ) ) ) ) ) | |
| **Defendants/Cross-Defendants/ Counter-Plaintiffs/Cross-Plaintiffs** | ) ) ) | |
| **FIRST SPECIALTY INSURANCE CORP.,** | ) ) | |
| **Intervenor Defendant/ Counter-Plaintiff/Cross-Plaintiff.** | ) ) ) | |

## OPINION AND ORDER

This case involves whether three insurers had the duty to defend and indemnify their insured in an underlying case, *Hinman* v. *M&M Rental Center, Inc.*, No. 06 C 1156, which was pending in this district before Judge Elaine Bucklo until it settled and a final order of judgment was entered October 6, 2009.  Maxum Indemnity Company ("Maxum") and Security Insurance Company of Hartford ("Security") seek a declaratory judgment that they did not have the duty to defend and need not indemnify M&M Rental Center, Inc. ("M&M").  M&M filed a counter-claim seeking declarations that Maxum and Security had the duty to defend and must indemnify M&M in the underlying litigation.  First Specialty Insurance Corporation ("FSIC") filed an intervening complaint seeking a declaration that FSIC did not have the duty to defend or

indemnify M&M and that Maxum and Security have the duty to defend and indemnify M&M. FSIC also requests equitable contribution from Maxum and Security for the costs it expended in defending M&M in the underlying suit. Robert Hinman and Italia Foods, Inc. ("Italia Foods"), plaintiffs in the underlying litigation, also filed counter-claims and cross-claims seeking declarations that Maxum, Security, and FSIC have the duty to defend and indemnify M&M.

As part of the settlement, M&M assigned the right to pursue its claims against Maxum and Security in this declaratory judgment action to the plaintiff class, represented by Hinman and Italia Foods.[1] With the underlying case concluded, this coverage case became ripe for decision.

Five motions for summary judgment are presently before the court. Despite the large volume of the motion papers, the facts are largely undisputed and the legal arguments repeated from one brief to another. For the following reasons, the court concludes that Maxum and Security had the duty to defend M&M while FSIC did not and that FSIC is entitled to reimbursement of its defense costs from Maxum and Security. Whether Security and Maxum have the duty to indemnify and the extent of that duty remain open issues.

## BACKGROUND

### I. The Maxum Policy

Maxum issued a commercial general liability policy to M&M covering the period from February 1, 2004 to February 1, 2005. As relevant to this litigation, the Maxum policy provides coverage for bodily injury, property damage, personal injury, and advertising injury, all terms specifically defined in the policy. Property damage is defined as "[p]hysical injury to tangible

---

[1] As matters between M&M, Hinman, Italia Foods, and FSIC were resolved by the settlement agreement in the underlying case, claims raised in this litigation involving these parties are moot.

property, including all resulting loss of use of that property" and "loss of use of tangible property that is not physically injured." Ex. A to Cunningham Aff. at M&M337 (hereinafter, "Maxum Policy"). The damage must be due to an occurrence, *i.e.* "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," *id.* at M&M336, that occurred during the policy period, *id.* at M&M322. Expected or intended injury is excluded from coverage. *Id.* at M&M322. Advertising injury includes "[o]ral or written publication of material that violates a person's right of privacy." *Id.* at M&M334. As with coverage for property damage, the advertising injury must be the result of an offense committed during the policy period. *Id.* at M&M328.

While Maxum has a duty to defend its insured against suits seeking damages to which the insurance policy applies, the duty is qualified by an allocation provision for mixed claims:

> In the event that a claim or "suit" seeks "damages," some of which are covered and others of which are not covered by this policy, the Insured must agree to a reasonable allocation of the costs and fees of defense, and the Insured will be responsible for payment of the costs and fees to defend the "damages" or claims not covered by this policy. This agreement shall be reached in writing, signed by the insurer and the Insured, prior to the date when a responsive pleading to the claim or "suit" is filed on behalf of the Insured. In the absence of such agreement, our duty to defend will only apply to those specific portions of the "suit" which are covered.[2]

Maxum Policy at M&M322, M&M328.

---

[2] This differs from the default rule in Illinois, which is that if there is a duty to defend one claim, the insurer must defend all claims. *See U.S. Fid. & Guar. Co.* v. *Wilkin Insulation Co.*, 578 N.E.2d 926, 930, 144 Ill. 2d 64, 161 Ill. Dec. 280 (1991).

## II.    The Security Policy

Security's predecessor in interest, Fire and Casualty Company of Connecticut, issued five commercial general liability policies to M&M effective from February 1, 2000 to February 1, 2004 (collectively, "the Security policy").[3]  The policy contains very similar provisions to that of the Maxum policy, with personal and advertising injury again including injury arising out of an invasion of privacy.  The policy does not include an allocation provision similar to that found in the Maxum policy, however.

## III.    The FSIC Policy

FSIC issued a commercial insurance policy to M&M covering the period from February 1, 2005 to February 1, 2006.  M&M cancelled this policy as of July 1, 2005.  Under the policy, FSIC has the duty to defend M&M against any suit seeking damages to which the policy applies, including bodily injury and property damage caused by an occurrence and personal and advertising injury arising out of an offense during the policy period.  Property damage and occurrence are defined as in the Maxum and Security policies, and expected or intended injuries are excluded from coverage.  Unlike the Maxum and Security policies, personal and advertising injury is defined more narrowly as:

> injury including consequential "bodily injury" arising out of one or more of the following offenses:
>
> a.    False arrest, detention or imprisonment;
> b.    Malicious prosecution;

---

[3] More specifically, the individual policies covered the following periods: February 1, 2000 to February 1, 2001; February 1, 2001 to February 1, 2002; February 1, 2002 to April 3, 2002; April 3, 2002 to February 1, 2003; and February 1, 2003 to February 1, 2004.

    c.      The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner landlord or lessor; or

    d.      Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

Ex. T to Smith Aff. at FSIC 01025. Invasion of privacy is not included within this list.[4]

## IV.    The Underlying Litigation

The class action complaint, filed November 14, 2005 by Eclipse Manufacturing Company ("Eclipse"), included claims for violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/2, and for common law conversion, all arising from the transmission of an unsolicited advertisement by M&M to Eclipse on June 23, 2005. A first amended complaint dropped the conversion and ICFA claims, focusing instead on the alleged TCPA violation that occurred upon the transmission of the June 23, 2005 fax.[5] This fax offers M&M's services in event planning, such as a "picnic, employee recognition dinner, meeting, trade show or even a 'holiday' party." Ex. B to Cunningham Aff. Eclipse sought to represent the following class:

> All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial

---

[4] The page cited to by FSIC in its L.R. 56.1 statement for the definition of personal and advertising injury, FSIC 01018, includes "[o]ral or written publication of material that violates a person's right of privacy" within the definition. This section, however, was deleted in its entirety and replaced with the narrower language quoted in the text of this opinion as part of an intellectual property endorsement adopted by FSIC and M&M.

[5] The fax attached to the first amended complaint indicates that it was sent on June 23, 2005, while the complaint references July 23, 2005. "[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *N. Indiana Gun & Outdoor Shows, Inc.* v. *City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998).

availability of any property, goods, or services by or on behalf of [M&M], and (3) with respect to whom [M&M] cannot provide evidence of prior express permission or invitation for the sending of such faxes.

*Id.* at ¶ 14. It claimed that the purported plaintiff class was damaged by M&M's actions because receipt of the fax "caused them to lose paper and toner," "prevented Plaintiff's fax machine from being used for Plaintiff's business purposes during the time [M&M] was using Plaintiff's fax machine for [M&M's] illegal purpose," and "cost Plaintiff employee time, as Plaintiff's employees used their time receiving, routing and reviewing [M&M's] illegal faxes and that time otherwise would have been spent on Plaintiff's business activities." *Id.* at ¶ 24.

After it was discovered that Eclipse had assigned the right to proceed with the action against M&M to Hinman, who was formerly Eclipse's sole owner, shareholder, and president, Hinman, as assignee, and Italia Foods filed a second amended complaint against M&M on June 15, 2007. The second amended complaint alleged that M&M sent unsolicited faxes on October 29, 2004 and June 23, 2005, and "on information and belief" on other occasions. Ex. C to Cunningham Aff. ¶¶ 11–14. The class definition remained the same. The sending of unsolicited faxes was said to damage recipients in the following ways:

A junk fax recipient loses the use of its fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy.[6] Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipient fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

---

[6] The complaint further specified that the relevant privacy interest was one of seclusion. Ex. C to Cunningham Aff. ¶ 35.

*Id.* at ¶ 3.  The October 29, 2004 fax was not attached to the complaint but was later produced in discovery.  This fax offered M&M's help with holiday parties and special events,[7] including corporate meetings, product introductions, team building, employee/customer entertaining, and trade shows.  Ex. G to Cunningham Aff.  The fax invited recipients to an industry open house to learn more about M&M's rental offerings and services.

Prior to the filing of the second amended complaint, Judge Bucklo had to determine whether Hinman had standing to pursue Eclipse's claims.  She concluded that he did, as a corporation could assign its TCPA claims.  *Eclipse Mfg. Co.* v. *M & M Rental Ctr., Inc.*, 521 F. Supp. 2d 739, 743–44 (N.D. Ill. 2007).  The assignment, however, was limited to the property interests protected by the TCPA, as corporations lack privacy interests in seclusion.  *Id.*

In their subsequent motion for class certification, Hinman and Italia Foods claimed that M&M sent unsolicited advertisements to the class on June 24, 2002, September 15, 2003, November 5, 2003, October 29, 2004, and June 23, 2005.  On April 7, 2008, Judge Bucklo certified a class defined as

> [a]ll persons who, on or after four years prior to the filing of this action, were sent, without permission, telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of [M&M].

*Hinman* v. *M & M Rental Ctr., Inc.*, 545 F. Supp. 2d 802, 808 (N.D. Ill. 2008).

The parties in the underlying litigation then filed cross-motions for summary judgment, which Judge Bucklo granted in part and denied in part on January 27, 2009.  *Hinman* v. *M & M Rental Ctr., Inc.*, 596 F. Supp. 2d 1152 (N.D. Ill. 2009).  The facts of the case, as found by the

---

[7] In his deposition, Berk, M&M's president, characterized backyard parties and weddings as "special events."  Ex. D to Cunningham Aff. 31:19-22.

district court, are as follows: In August 1997, Michael Berk, M&M's president, purchased a list of names and fax numbers (the "leads list") from Corporate Marketing, Inc. ("CMI"). The leads list consisted of approximately 5,000 contacts, including Eclipse and Italia Foods. Hinman was listed as the contact name for Eclipse. CMI included companies on the list that were likely to spend over $5,000 per year on corporate parties, meetings, and banquets. M&M used Xpedite Systems ("Xpedite") to send fax blasts to the leads list on at least five occasions between June 2002 and June 2006. According to Xpedite's records, the first fax ("fax #1") was sent on June 24, 2002 to 4,469 recipients. The second fax ("fax #2") was sent on September 15, 2003 to 4,288 recipients. The third fax ("fax #3") was sent on November 5, 2003 to 4,174 recipients. No copies of faxes #1-3 were produced in the underlying litigation and their content is unknown. The fourth fax ("fax #4") was sent on October 29, 2004 to 3,944 recipients. The fifth fax ("fax #5") was sent on June 23, 2005 to 3,781 recipients. Copies of faxes #4 and #5 were produced in the litigation. Judge Bucklo concluded that faxes #4 and #5 violated the TCPA and granted judgment in favor of plaintiffs as to these faxes. The plaintiff class was awarded statutory damages of $3,862,500 for these violations.[8] Because no copies of faxes #1-3 were produced and the circumstantial evidence of the content of these faxes was too attenuated to carry plaintiffs' burden of demonstrating that the faxes were advertisements, Judge Bucklo granted judgment for M&M on these faxes. She was "aware of no case (nor do plaintiffs cite any) in which a plaintiff has prevailed under the TCPA where it cannot produce a copy of the allegedly offending advertisement." *Id.* at 1163.

---

[8] The TCPA provides for statutory damages of $500 per unsolicited fax or in the amount of the actual monetary loss, whichever is greater. 47 U.S.C. § 227(b)(3)(B). 7,725 faxes were sent on October 29, 2004 and June 23, 2005, which multiplied by $500 equals $3,862,500.

After the summary judgment order was entered, Hinman and Italia filed a motion to reconsider, arguing that there was a genuine issue of fact as to whether faxes #1-3 were advertisements. M&M also sought reconsideration, claiming that because Hinman and Italia Foods had failed to provide adequate notice of the lawsuit to the class prior to the summary judgment ruling, damages should only be awarded for the two faxes the named plaintiffs received. The parties agreed to stay briefing on these post-judgment motions pending settlement discussions. All parties in the underlying litigation and this coverage action then participated in an unsuccessful settlement conference. A subset of the parties, Hinman, Italia Foods, M&M, and FSIC, resumed settlement discussions that ultimately proved fruitful. The settlement agreement provided that M&M would consent to entry of judgment against it for $5,817,150. This amount was apportioned to the five faxes, with $685,350 allocated to fax #1, $643,200 to fax #2, $626,100 to fax #3, $1,972,000 to fax #4, and $1,890,500 to fax #5.[9] Hinman and Italia Foods agreed not to execute the judgment against any of M&M's assets other than its non-FSIC insurance policies.[10] FSIC agreed to pay $100,000 into a trust for the benefit of the class to satisfy the judgment as to fax #5. A fairness hearing was held on September 10, 2009. Final approval of the settlement and judgment was entered on October 6, 2009. The order of final approval and judgment provided that the agreement was the "result of good faith arm's length negotiations by the parties," Ex. Q to Cunningham Aff. ¶ 8, and was "made in reasonable anticipation of liability," *id.* ¶ 10. The order stated that the settlement amount was fair and reasonable, that the amount was "what a reasonably prudent person in [M&M's] position would

---

[9] These figures amount to $150 per fax for faxes #1-3 and $500 per fax for faxes #4 and #5.

[10] The order also excluded additional insurance policies M&M had for the period of February 1, 2005 to February 1, 2006, including one provided by the James River Insurance Company.

have settled for on the merits of the claims in this Litigation," and that M&M conformed to the standard of a prudent uninsured in settling. *Id.* As a condition of settlement, summary judgment was vacated.

## V.      Coverage of the Underlying Action

On December 20, 2005, FSIC agreed to defend M&M in the underlying litigation pursuant to a reservation of rights. Due to FSIC's reservation of rights, M&M controlled its own defense but was reimbursed for its costs in accordance with FSIC's billing guidelines. As of November 19, 2009, FSIC had incurred $643,134.05 in costs and fees in defending M&M in the underlying litigation. By July 27, 2006, Maxum and Security had notice of the underlying litigation. $576,207.60 of the defense costs were incurred on or after this date.

On September 13, 2006, Maxum and Security filed this declaratory judgment action. $547,553.23 of the total defense costs were incurred on or after that date. FSIC was given leave to intervene in this action on November 5, 2008. Hinman and Italia Foods were added as defendants on December 3, 2007 but were not served until March 11, 2009. Their counsel, however, received the complaint on December 3, 2007 and actively participated despite Hinman and Italia Foods not being served.

## IV.      The Leads List

One of the few relevant factual disputes in this case involves whether the underlying plaintiff class is composed solely of business entities or also includes natural persons. The class was defined to include "all persons" who received fax advertisements. These advertisements were sent to fax numbers contained on the leads list. The leads list includes four columns, headed "ref," "type," "addr," and "header." Ex. E to Cunningham Aff. The "ref" column

10

generally contains company names, although it also includes the names of individuals without an accompanying company or entity name.  For example, Henry Bechstein, Phillip R. Suth, and Ronald S. Jacobson are all listed in the "ref" column with no indication that the names refer to anything or anyone other than natural persons.  The "type" column identifies that the number provided in the "addr" column is a fax number.  The "header" column provides a contact name to whom the faxes were addressed.

Berk testified that the faxes he sent to contacts on the leads list were sent to companies.  Judge Bucklo, in her now vacated summary judgment order, with no mention of natural persons, referred to the faxes as having been sent to companies.  Further discovery regarding the leads list was not undertaken in this litigation.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.  Fed. R. Civ. P. 56(c) & advisory committee's notes.  The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact.  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial.  *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).  A material fact is one that might affect the outcome of the suit.  *Insolia*, 216 F.3d at

598–99.  Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.  Duty to Defend

Under Illinois law, "an insurer's duty to defend is determined by comparing the allegations in the underlying complaint to the relevant provisions of the insurance policy." *LaGrange Mem'l Hosp.* v. *St. Paul Ins. Co.*, 740 N.E.2d 21, 26, 317 Ill. App. 3d 863, 251 Ill. Dec. 191 (2000).  The duty to defend is broader than the duty to indemnify; an insurer may be required to defend even though it ultimately may not be required to indemnify the insured. *Zurich Ins. Co.* v. *Raymark Indus., Inc.*, 514 N.E.2d 150, 163, 118 Ill. 2d 23, 112 Ill. Dec. 684 (1987).  The duty to defend arises if the complaint's allegations fall within or potentially within the policy's coverage.  *LaGrange Mem'l Hosp.*, 740 N.E.2d at 26.  "[T]he complaint need present only a possibility of recovery, not a probability of recovery."  *Id.* at 27.  An insurer may not refuse to defend its insured "unless it is *clear* from the face of the underlying complaint[ ] that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage."  *U.S. Fid. & Guar. Co.* v. *Wilkin Insulation Co.*, 578 N.E.2d 926, 930, 144 Ill. 2d 64, 161 Ill. Dec. 280 (1991).  In a declaratory judgment action, the court may look beyond the allegations of the underlying complaint to determine whether the insured's action falls within one of the insurance policy's exclusions, so as to defeat the duty to defend, if such

evidence does not go to an ultimate fact in the underlying litigation. *Fremont Comp. Ins. Co.* v. *Ace-Chicago Great Dane Corp.*, 710 N.E.2d 132, 138–39, 304 Ill. App. 3d 734, 237 Ill. Dec. 709 (1999); *Fid. & Cas. Co. of N.Y.* v. *Envirodyne Eng'rs*, 461 N.E.2d 471, 473–75, 122 Ill. App. 3d 301, 77 Ill. Dec. 848 (1983). Any doubts as to coverage are to be resolved in favor of the insured. *Wilkin*, 578 N.E.2d at 930.

### A.     Property Damage Coverage

The FSIC, Maxum, and Security policies contain the same property damage provision. Coverage exists for property damage caused by an occurrence as long as the damage is not expected or intended by the insured. The underlying complaint alleged that a recipient of unauthorized faxes "loses the use of its fax machine, paper, and ink toner." Ex. C to Cunningham Aff. ¶ 3. The Seventh Circuit, in considering the identical situation, concluded that property damage coverage clearly does not apply to this loss as the senders of the faxes anticipate that the recipient's paper and toner will be used upon receipt of the fax. *Am. States Ins. Co.* v. *Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939, 943 (7th Cir. 2004). As the property damage to the plaintiff class was expected by M&M, under *American States*, coverage is foreclosed. *See id.* ("Because *every* junk fax invades the recipient's property interest in consumables, this normal outcome is not covered."). FSIC, Maxum, and Security thus had no duty to defend M&M based on the property damage provision in their policies.[11]

### B.     Personal and Advertising Injury Coverage

_____

[11] Hinman and Italia recognize that this court is bound by the Seventh Circuit's ruling in *American States*. They do, however, raise the issue in order to preserve it for appeal, citing to an Illinois appellate court decision, *Ins. Corp. of Hanover* v. *Shelborne Assocs*, 905 N.E.2d 976, 389 Ill. App. 3d 795, 329 Ill. Dec. 138 (2009), that is in conflict with *American States*. Bound by *American States*, the court need not consider whether *Shelborne Associates* dictates a different outcome in this case.

### 1.    FSIC

The FSIC policy provides coverage for personal and advertising injury in only limited circumstances.  Specifically, coverage is provided for false arrest, detention, or imprisonment; malicious prosecution; wrongful eviction, entry, or invasion; and slander, libel, or disparagement.  Invasion of privacy, the only potential advertising injury at issue in the underlying suit, is not covered.  Because the allegations in the underlying complaint do not fall even potentially within FSIC's personal and advertising injury coverage, FSIC did not owe M&M the duty to defend.

### 2.    Maxum and Security

Unlike FSIC, whose policy included an endorsement narrowing the scope of its advertising injury coverage, the Maxum and Security policies include invasion of privacy as a covered offense.  Maxum and Security nonetheless contest whether the allegations of the complaint gave rise to a potentially covered invasion of privacy claim.  They first argue that the TCPA blast fax provision does not protect privacy interests.  This argument, however, has been rejected by both the Seventh Circuit and the Illinois Supreme Court.  *See Valley Forge Ins. Co.* v. *Swiderski Elecs., Inc.*, 860 N.E.2d 307, 315, 223 Ill. 2d 352, 307 Ill. Dec. 653 (2006) ("The receipt of an unsolicited fax advertisement implicates a person's right of privacy insofar as it violates a person's seclusion, and such a violation is one of the injuries that a TCPA fax-ad claim is intended to vindicate."); *Am. States*, 392 F.3d at 942 ("Section 227(b)(1)(C) doubtless promotes this (slight) interest in seclusion . . . .").

The Seventh Circuit had predicted in *American States* that, under Illinois law, the invasion of privacy provision in the Maxum and Security policies does not cover TCPA claims

because it only protects against violations of the right to secrecy while a TCPA privacy violation involves the right to seclusion. 392 F.3d at 941–43. This prediction was rejected by the Illinois Supreme Court in *Valley Forge*, which held that an almost identical provision covers the invasion of both secrecy and seclusion and thus TCPA claims. 860 N.E.2d at 320, 323. Under *Valley Forge*, the TCPA claim in the underlying case is potentially covered under the advertising injury provisions in the Maxum and Security policies.[12]

Maxum and Security, however, maintain that *Valley Forge* is distinguishable under the particular facts of the underlying case. Principally, they argue that the class involved here is composed solely of business entities and that business entities do not have privacy interests in seclusion. The Seventh Circuit has held that "businesses lack interests in seclusion." *Am. States*, 392 F.3d at 942 ("Where does a corporation go when it just wants to be left alone?"); *see* Restatement (Second) of Torts § 652I cmt. c ("A corporation, partnership or unincorporated association has no personal right of privacy."). This does not mean that a business entity cannot bring a TCPA claim but just that "corporations bringing claims under the TCPA may only assert the property interests the TCPA was designed to protect." *Eclipse Mfg. Co.*, 521 F. Supp. 2d at 743–44; *see also Am. States*, 392 F.3d at 942 ("Our point is not that business entities lack interests protected by § 227(b)(1)(C), but that it does not help to call them 'privacy' interests.").[13] Judge Bucklo agreed in the underlying case when she ruled that Eclipse could

_____

[12] Although the initial and first amended complaints do not specifically mention invasion of a privacy right, a violation of the right to seclusion is implicit in a TCPA fax blast claim. *Valley Forge*, 860 N.E.2d at 316.

[13] Some cases in other circuits have found a duty to defend under a similar advertising injury provision where the fax recipient was a corporation. *See, e.g.*, *Park Univ. Enters., Inc.* v. *Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239 (10th Cir. 2006); *Universal Underwriters Ins. Co.* v. *Lou Fusz Auto. Network, Inc.*, 401 F.3d 876 (8th Cir. 2005); *W. Rim Inv. Advisors, Inc.* v. *Gulf Ins. Co.*, 269 F. Supp. 2d

assign its TCPA claim to Hinman but that he, as Eclipse's assignee, was restricted to asserting the property interest protected by the TCPA. *Eclipse Mfg. Co.*, 521 F. Supp. 2d at 743–44.

While Maxum and Security are right that only individuals have privacy interests protected by the TCPA, it is not clear that only business entities make up the plaintiff class. Although brought by business entities, the complaint does not foreclose the possibility that individuals are included in the plaintiff class.[14] The class definition speaks of persons, not just business entities. The plain and ordinary meaning of "person" extends to both individuals and business entities. *See* 1 U.S.C. § 1 ("person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); Black's Law Dictionary 1178 (8th ed. 2004) (including among definitions of "person" both "a human being" and "an entity (such as a corporation) that is recognized by law as having most of the rights and duties of a human being"); Webster's Third New International Dictionary 1686 (1981) (person is defined to include "a human being, a body of persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties"). By using the word person in broadly defining the fax recipients, the complaint does not clearly establish that only business entities make up the class. Nor does extrinsic evidence do so. The leads list, in fact,

_____

836 (N.D. Tex. 2003), *aff'd*, 96 F. App'x 960 (5th Cir. 2004). None of these cases discusses whether corporations have such a right of privacy or whether the putative classes in those cases potentially included natural persons, however.

[14] The argument that the individuals to whom the faxes were addressed are class members separate and apart from the entities with which they are connected is unavailing. This was implicitly recognized by the underlying plaintiffs, as Hinman pursued the TCPA action in Eclipse's name, not on his own behalf. As Hinman received the fax on behalf of Eclipse at his company's office, his personal right of seclusion was not invaded. *See Am. States*, 392 F.3d at 942 ("Corporate managers have interests in seclusion . . . . A fax is less disturbing than a phone call, and a business-related call at work does not invade the managers' interest in seclusion.").

suggests just the opposite: that some, albeit a small number, of the faxes were sent to individuals not tied to a business entity.

Maxum and Security also argue that the content of the June 23, 2005 fax attached to the complaint clearly establishes that the alleged injury falls outside the advertising injury provision because it shows that the faxes targeted companies. While the content is directed to business entities, as the fax opens with the line "Is your company planning an affair?", Ex. B to Cunningham Aff., the intended audience does not automatically exclude individuals from the recipient list. Further, as another court in this district recognized when confronted with the same argument, "[e]ven if [M&M] only selected businesses to send its advertisement to, it is possible that a person's right to privacy still was invaded, for example, if an advertisement was sent to an individual who operated as a sole proprietorship." *Maxum Indemnity Co.* v. *Global Gear Sales Co.*, Case No. 06 C 872, Dkt. No. 132 (N.D. Ill. Apr. 30, 2008); *see also Valley Forge*, 860 N.E.2d at 310 (plaintiff was an individual doing business as a private investigation business). Similarly, Maxum's and Security's argument that the policy language only provides coverage for individuals' as opposed to organizations' rights to privacy does not alter their duties to defend. The Maxum and Security policies state that injury arising from the publication of material that violates "a person's right to privacy" is covered. Another covered advertising injury is that which results from the publication of material "that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Maxum Policy at M&M334. Maxum and Security argue that only provisions referring to both persons and organizations are intended to cover business entities. Where the term "person" is not defined in an insurance policy, however, it is given its plain and ordinary meaning. *Supreme*

*Laundry Serv., L.L.C.* v. *Hartford Cas. Ins. Co.*, 521 F.3d 743, 747 (7th Cir. 2008). As discussed above, the dictionary definition of person includes both natural persons and business entities. *Id.* Even though some provisions use person or organization, where person is used alone, it will not be read "to refer to simply natural persons when it can plausibly apply to a corporate entity, especially where the drafters never expressed any intent that usage of the term was meant only to refer to natural persons." *Id.* at 748. Thus, the use of only "person" in the relevant provision here does not confine it to natural persons unless the provision cannot apply to business entities. *See id.* (using as an example the fact that corporations cannot suffer bodily injury). Because business entities lack privacy rights, the provision can only apply to natural persons. Nonetheless, as the class potentially included individuals as well as organizations, the policy language did not rule out coverage.

This does not end the inquiry, however, as the duty to defend was only triggered if the alleged privacy violation occurred while the policies were in effect. Maxum does not dispute this, but Security argues that the underlying complaint contained no allegations that an advertisement violating the TCPA was sent during its policy periods. While the initial and amended complaints in the underlying action specify only two dates on which faxes were sent, October 29, 2004 and June 23, 2005, both outside of Security's policy periods, the class definition used throughout includes persons who received faxed advertisements from M&M beginning in 2001. The second amended complaint also alleges that M&M sent unsolicited advertisements to Eclipse and Italia Foods "on other occasions." Ex. C to Cunningham Aff.

¶ 14.  These allegations raised the possibility that advertisements in violation of the TCPA were sent while Security's policies were in effect.[15]

Security claims that extrinsic evidence, specifically Judge Bucklo's now vacated summary judgment order finding no TCPA violation for faxes #1-3, establishes that the only alleged TCPA violations occurred outside Security's policy period.  Judge Bucklo based her ruling on the absence of copies of faxes #1-3, despite there being circumstantial evidence that the faxes sent during Security's policy period constituted advertisements as defined by the TCPA.  Using Judge Bucklo's order as evidence that no duty to defend existed under the Security policy effectively equates the duty to defend with the duty to indemnify, as the order goes to an ultimate fact in the underlying case — whether the faxes sent during the Security policy period were advertisements under the TCPA.  There is no question, however, that faxes were sent during the policy period.  Accordingly, Maxum and Security had the duty to defend under the advertising injury provisions in their policies.

## C.        Equitable Contribution

FSIC defended M&M in the underlying suit pursuant to a reservation of rights.  It now seeks to recover the defense costs incurred on or after Maxum and Security received notice of the underlying suit on July 27, 2006 totaling $576,207.60.  Equitable contribution "as it pertains to insurance law is an equitable principle arising among coinsurers which permits one insurer who has paid the entire loss, or greater than its share of the loss, to be reimbursed from other insurers who are also liable for the same loss."  *Home Ins. Co.* v. *Cincinnati Ins. Co.*, 821 N.E.2d

---

[15] In fact, the dates on which faxes #1-3 were sent had been identified in the public record prior to the filing of the second amended complaint.  *See Eclipse Mfg. Co.* v. *M&M Rental Ctr., Inc.*, No. 06-1156, dkt. no. 67 (filed January 18, 2007) (Eclipse reply to its motion for class certification).

269, 276, 213 Ill. 2d 307, 290 Ill. Dec. 218 (2004). FSIC shouldered the entire costs of M&M's defense, even though it did not have the duty to defend. It is thus entitled to reimbursement of its costs from Maxum and Security unless it acted as a volunteer in assuming the defense.

A volunteer is one who has made a payment not under compulsion, legal obligation, or to preserve its rights. *See Progressive Ins. Co.* v. *Univ. Cas. Co.*, 807 N.E.2d 577, 589, 347 Ill. App. 3d 10, 282 Ill. Dec. 953 (2004) (quoting *Aetna Life Ins. Co.* v. *Town of Middleport*, 124 U.S. 534, 539, 8 S. Ct. 625, 31 L. Ed. 537 (1888)); 16 Couch on Insurance § 223:25. An insurer that makes payments with a reasonable, good faith belief in liability is not considered a volunteer, even if no liability is ultimately found. 16 Couch on Insurance § 223:27. While this court has concluded that FSIC did not to have a duty to defend, FSIC did not act as a volunteer in defending M&M in the underlying suit. It did exactly what the law encourages insurers to do when faced with a situation of debatable coverage: defend under a reservation of rights in order to ensure that it is not later estopped from raising coverage defenses. FSIC may have acted out of an abundance of caution, concerned that the Seventh Circuit's ruling on property damage coverage in *American States* would be overruled by the Illinois Supreme Court. An Illinois appellate court did subsequently rule the other way on the issue, *see Ins. Corp. of Hanover* v. *Shelborne Assocs.*, 905 N.E.2d 976, 389 Ill. App. 3d 795, 329 Ill. Dec. 138 (2009), but the issue has not been taken up by the Illinois Supreme Court. Given the *American States* court's conclusion that the property damage question was not even close, the chance of the Seventh Circuit's reversing course is slim. Nonetheless, there is some indication that FSIC defended so as to preserve its rights and not because it desired to expend money where not required as a volunteer. Reaching a contrary result "would discourage insurers[ ] from defending their insured

where there is a dispute over coverage." *Westport Ins. Co.* v. *St. Paul Fire & Marine Ins. Co.*, 375 F. Supp. 2d 4, 9 (D. Conn. 2005). Consequently, FSIC is entitled to reimbursement from Maxum and Security for the cost of M&M's defense incurred on or after July 27, 2006.

The proper allocation of the costs of M&M's defense between Maxum and Security depends on whether Maxum's allocation provision is enforceable. The allocation provision relieves Maxum of the duty to defend parts of the underlying suit that are not covered. This, arguably, means that Maxum is only obligated to furnish costs of the defense that can reasonably be allocated to the invasion of individuals' privacy rights. In Illinois, the default rule is that an insurer must defend against all claims in the underlying suit, even if only one claim is potentially covered by the policy. *Wilkin*, 578 N.E.2d at 930. Like any default, the rule may be varied by a provision in the insurance policy to the contrary. *Cf. Gen. Agents Ins. Co. of Am.* v. *Midwest Sporting Goods, Co.*, 828 N.E.2d 1092, 1103, 215 Ill. 2d 146, 293 Ill. Dec. 594 (2005) ("[I]f an insurer wishes to retain its right to seek reimbursement of defense costs in the event it later is determined that the underlying claim is not covered by the policy, the insurer is free to include such a term in its insurance contract."). The parties have not cited, nor has the court been able to locate, any cases discussing the enforceability of Maxum's or similar allocation provisions in Illinois. The only case touching on the issue, *Global Gear*, simply assumes that the allocation provision is enforceable. *See Global Gear*, No. 06 C 872, dkt. no. 83 ("Should a duty to defend arise, the allocation clause will apply to relieve Maxum from defending those portions of the suit which are not covered."); *id.* dkt. no. 143.

FSIC first argues that the provision is unenforceable because its terms are too indefinite. While the provision does include the option of the insurer and the insured agreeing to a

reasonable allocation of costs, what happens in the absence of an agreement is clear: Maxum will only defend covered claims. This established fallback position distinguishes the provision from a mere agreement to agree. FSIC also argues that M&M was not given the opportunity to reach an agreement with Maxum, but this is immaterial. Maxum has maintained from the time it received notice of the underlying suit that it has no duty to defend and thus is not responsible for any costs. While the court has concluded otherwise, Maxum's failure to seek an agreement does not make the provision unenforceable. Finally, FSIC claims that the allocation provision is coercive and forbidden under Illinois law as it attempts to impose a cost-sharing arrangement on the insured only after the insured has been sued. The case FSIC relies on, *Midwest Sporting Goods*, does hold that an insurer cannot seek reimbursement from an insured where the right to reimbursement is asserted not in the insurance policy but rather when the insurer agrees to defend pursuant to a reservation of rights. 828 N.E.2d at 1104. But *Midwest Sporting Goods* allows for reimbursement if it is expressly provided for in the insurance policy. Maxum clearly specifies *in its policy* that it will only cover costs associated with defending covered claims. This does not run afoul of *Midwest Sporting Goods*. Because the court finds no reason not to enforce the allocation provision contained in the Maxum policy, Maxum will only be required to pay the defense costs that can reasonably be allocated to covered claims. The parties are instructed to determine the appropriate allocation of the costs of defense among the implicated Maxum and Security policies.

## II.     Duty to Indemnify

The duty to indemnify is narrower than the duty to defend. *Outboard Marine Corp.* v. *Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1221, 154 Ill. 2d 90, 180 Ill. Dec. 691 (1992). It can be

determined only after the insured becomes legally obligated to pay damages in the underlying suit. *Id.* An insurer must indemnify the insured for a loss if it *actually* falls within the insurance policy's coverage. *Id.* The insured, in this case the plaintiff class standing in M&M's shoes, has the burden to prove that the liability incurred in the underlying suit is covered by the policy. *St. Michael's Orthodox Catholic Church* v. *Preferred Risk Mut. Ins. Co.*, 496 N.E.2d 1176, 1179, 146 Ill. App. 3d 107, 100 Ill. Dec. 111 (1986). Where liability was incurred because of settlement, the insured must establish that it settled "an otherwise covered loss in 'reasonable anticipation of personal liability.'" *Fed. Ins. Co.* v. *Binney & Smith, Inc.*, 913 N.E.2d 43, 48, 393 Ill. App. 3d 277, 332 Ill. Dec. 448 (2009). Where multiple claims are involved, an insured is not required to apportion liability but must instead demonstrate that a primary focus of settlement was a claim covered by the insurance policy. *Santa's Best Craft, LLC* v. *St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 350–51 (7th Cir. 2010). This is because apportioning liability for different claims "would either require the coverage litigation to be a retrial of the merits of the insured's underlying lawsuit and/or would discourage settlement because the insured would essentially have to prove its own liability for the underlying conduct even if it had not made that concession in arriving at a settlement." *Id.* (citing *Commonwealth Edison Co.* v. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 752 N.E.2d 555, 565–66, 323 Ill. App. 3d 970, 256 Ill. Dec. 675 (2001)). The insured is required "to establish *when* the covered claims arose to allocate responsibility for paying the settlement based on which insurer's policy was in effect at the time."[16] *Id.*

---

[16] There is no dispute about when the faxes were sent and the amounts that would be allocable to the various insurance policies at issue.

Two issues arise with respect to the duty to indemnify. First, the court must consider whether the settlement was entered into in reasonable anticipation of liability. Second, the court is faced with whether Maxum and Security can be held liable for any, part, or all of the settlement amounts attributed to faxes #1-4 based on the fact that coverage exists only for faxes sent to individuals not connected to a business entity.

### A.    Reasonableness

Maxum rightfully does not dispute that, as to fax #4, M&M entered the settlement agreement in reasonable anticipation of liability. Judge Bucklo had already entered judgment against it on this fax and it was highly unlikely that M&M's motion to reconsider the amount of damages would succeed. There is a genuine dispute about whether M&M acted reasonably in agreeing to an award of damages for faxes #1-3, however.

A settlement that effectively lets the insured off the hook gives rise to concerns about collusion. In such a case, as here, the settlement will bind Security only if Hinman and Italia Foods prove that the settlement was reasonable. *Guillen ex rel. Guillen* v. *Potomac Ins. Co. of Illinois*, 785 N.E.2d 1, 14, 203 Ill. 2d 141, 271 Ill. Dec. 350 (2003). Security has the right to rebut any showing of reasonableness. *Id.* In determining reasonableness, the court should consider whether the settlement was made in reasonable anticipation of liability and "whether, considering the totality of circumstances, the insured's decision conformed to the standard of a prudent *uninsured*." *Id.* (internal quotation marks omitted). Some factors to consider include the facts bearing on liability and damages and the costs and risks of going to trial. *Id.*

Although Judge Bucklo held a fairness hearing on the settlement agreement and entered findings that the settlement amount agreed to was "what a reasonably prudent person in

[M&M's] position would have settled for on the merits of the claims in this Litigation" and that M&M conformed to the standard of a prudent uninsured in deciding to settle, Ex. Q to Cunningham Aff. ¶ 10, this does not satisfy Hinman and Italia Foods' burden. *See Stonecrafters, Inc.* v. *Wholesale Life Ins. Brokerage, Inc.*, 915 N.E.2d 51, 60–63, 393 Ill. App. 3d 951, 333 Ill. Dec. 530 (2009). Nor is Security collaterally estopped from challenging the reasonableness of the settlement in this proceeding. *Id.* at 63.

Security argues that M&M did not act in reasonable anticipation of liability in agreeing to settle claims related to faxes #1-3 because Judge Bucklo had already found in M&M's favor on these faxes. While the summary judgment order was vacated as part of the settlement, the fact that no copies of faxes #1-3 were ever produced remains unchanged. Hinman and Italia Foods respond by referencing the circumstantial evidence they had produced that at least, in their opinion, created a genuine issue of material fact as to whether faxes #1-3 were advertisements. This evidence included Berk's testimony on the purpose of purchasing the leads list, copies of fliers created by M&M that could not be connected to a particular fax transmission, and records showing that faxes were sent to the leads list on dates corresponding to faxes #1-3. Hinman and Italia Foods argue that, despite Judge Bucklo's contrary summary judgment ruling, M&M could have reasonably anticipated incurring liability on faxes #1-3 because Hinman and Italia Foods had filed a motion for reconsideration contending that there was a genuine dispute as to faxes #1-3. Alternatively, M&M faced the possibility of an appeal, further drawing out the litigation. Hinman and Italia Foods also emphasize the reasonableness of the amount for which the claims for faxes #1-3 were compromised, as $150 per fax in damages is well below the $500 per fax provided by statute. This discount may have been an acknowledgment of the comparative

weakness of the evidence for these three faxes as compared to that for faxes #4 and #5. Although Hinman and Italia Foods' argument as to reasonableness is something of a stretch, they have at least raised a genuine dispute about it, necessitating the denial of summary judgment on the issue of indemnity for those amounts apportioned to faxes #1-3.

### B. Allocation

In cases involving multiple claims, an insurer will be liable for the entire amount of the settlement if a primary focus was a covered claim. *Santa's Best Craft*, 611 F.3d at 350–52. Here, however, there was only one claim yet coverage only exists for a subsection of the plaintiff class on whose behalf the settlement was entered. The TCPA claim was obviously the primary focus in coming to an agreement to end the underlying action. Only amounts that can be attributed to faxes sent to individuals not associated with a business entity on the leads list are actually covered by the Maxum and Security policies. The parties in the underlying suit were not focused on whether the settlement compensated the plaintiff class for a loss or property or a privacy intrusion or any other injury alleged in the complaint. They also were not concerned with whether a part of the class was made up of individuals and another part of business entities as these issues are only relevant to the coverage action. This situation is more akin to those cases requiring the insured to allocate between covered and non-covered losses based on timing, *see, e.g.*, *Binney*, 913 N.E.2d at 54, 56–57; *St. Michael's*, 496 N.E.2d at 1179, than those finding allocation inappropriate because multiple claims were compromised, *see, e.g.*, *Santa's Best Craft*, 611 F.3d at 352; *Binney*, 913 N.E.2d at 53–54. An extensive mini-trial of the merits of the underlying case to determine apportionment would not be required, as the only open issue is how many fax numbers on the leads list belonged to individuals not associated with a corporate

26

entity. Discovery was not pursued on the issue and Hinman, Italia Foods, and FSIC have only identified several names on the leads list that appear to fit the criteria. Summary judgment will be denied on indemnity and the parties will be given the opportunity to discover the extent of any indemnity obligation in accordance with this ruling. Alternatively, the parties should seriously consider settling the issue in lieu of expending additional costs for what is likely to be a relatively small recoverable amount.

## CONCLUSION AND ORDER

For the foregoing reasons, FSIC's motion [#246] is granted. Maxum's motion [#254] is granted in part and denied in part as to the duty to defend and denied as to the duty to indemnify. Security's motion [#261] is denied as to the duty to defend and the duty to indemnify. Hinman and Italia Food's motions [#275, #277] are granted as to the duty to defend and denied as to the duty to indemnify.

FSIC had no duty to defend M&M in the underlying suit, while Maxum and Security did. Maxum and Security must reimburse FSIC for the costs and fees it incurred in defending M&M on or after July 27, 2006. Maxum and Security are instructed to attempt to reach an agreement as to the proper allocation of these defense costs between them. Further discovery on the duty to indemnify will be allowed.

This case will be called for a status hearing on July 12, 2011 at 8:30 a.m. The parties are instructed to engage in a sincere effort to resolve this litigation and to report on these efforts and any other outstanding issues at the status hearing.

Dated: June 13, 2011                                    Enter:

_____
JOAN HUMPHREY LEFKOW
United States District Judge